## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

KENNETH E. COOPER,

       Plaintiff,

vs.                                                                   Civ. No. 06-468 JP/RLP

WAL-MART STORES, INC.,

       Defendant.

### MEMORANDUM OPINION AND ORDER

On July 6, 2007 Defendant filed its Motion for Summary Judgment, seeking summary judgment on all of Plaintiff's claims. (Doc. No. 49.) On August 3, Plaintiff filed a Memorandum Brief in Opposition to Defendant's Motion for Summary Judgment ("Response") (Doc. No. 52), and Defendant filed a Reply in Support of Defendant's Motion for Summary Judgment on August 20 ("Reply"). (Doc. No. 54.) The Court held a pretrial conference on October 3, 2007 and heard arguments on the motion.

Having considered these arguments, the briefs, and admissible evidence in the record, the Court concludes that summary judgment should be granted on Plaintiff's claims of discrimination and retaliation under Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act (ADEA). The Court also concludes that summary judgment should be granted on Plaintiff's claim of invasion of privacy by appropriation of his name and likeness. In regard to Plaintiff's breach of contract claims for vacation pay and compensation for Plaintiff's work on holidays, summary judgment should be granted as to Plaintiff's claim for

"holiday pay" but should be denied as to Plaintiff's claim for compensatory time off in lieu of "holiday pay" and denied as to Plaintiff's claim for vacation pay.

## I. Introduction and Factual Background

This case arises from the termination of the employment of Plaintiff Kenneth E. Cooper as the store manager of the Wal-Mart Super Center in Silver City, New Mexico. Mr. Cooper served as the store manager from 1998 to 2005. In 2003, Plaintiff's application for a district manager position was rejected, and Plaintiff complained in an e-mail to regional manager Al Serrano that Wal-Mart's process for advertising and selecting district manager positions demonstrated "disparity of treatment." (Cooper Dep., Response Ex. D, at 52–54.)

In September 2005, the Wal-Mart Ethics Hotline received an anonymous complaint about Plaintiff. Wal-Mart investigated the allegations in accordance with its policies. Corporate Fraud Examiner Jennifer Boyd (now Jennifer Webster) led the investigation, which involved interviews with approximately twenty-one store associates and examination of written statements and store documents. The investigation substantiated several allegations of serious misconduct, including misappropriation of company funds, harassment of and inappropriate conduct regarding subordinates, and conflict of interest arising from an improper relationship with a subordinate female associate. Boyd reported the findings of the investigation (Ex. A to Webster Decl., MSJ Ex. 3) to Michael Moore, Senior Vice President, Operations West of Wal-Mart Stores, who decided to terminate Plaintiff for gross misconduct. (MSJ ¶ 30; Moore Decl., MSJ Ex. 2.) Plaintiff's employment was terminated on October 12, 2005 by District Manager Pedro Andrade. After termination of his employment, Plaintiff stated his disagreement with this action and

alleged discriminatory treatment because Defendant did not fire other management personnel for similar conduct. Defendant investigated Plaintiff's reports of misconduct by the other five store managers, the District Manager, and the District Loss Prevention Supervisor. Defendant was able to substantiate some of Plaintiff's allegations, and took disciplinary action where it deemed appropriate.

Plaintiff, who is African-American, was 51 years old at the time Defendant terminated his employment. He alleges that Defendant's action was the result of race and age discrimination, and brings claims under both Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2000e-17 (2006), and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634 (2006). He also alleges that Defendant terminated his employment in retaliation for protected activity under the ADEA—specifically for his 2003 complaint of discrimination—as prohibited by 29 U.S.C. § 623(d). Plaintiff alleges several nonfederal causes of action, including: breach of contract for Defendant's failure to pay him appropriate holiday and vacation pay upon termination of his employment, and tortious appropriation of his name and likeness.

## II. Standard: Motion for Summary Judgment

Summary judgment is appropriate only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Santana v. City & County of Denver*, 488 F.3d 860, 864 (10th Cir. 2007) (citing Fed. R. Civ. P. 56(c)). The court must examine the record and draw reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000). Summary judgment is proper where the record, taken as a whole, could not lead a rational trier of

fact to find for the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.")


### III. Discussion

### A. Plaintiff's Title VII and ADEA Discrimination Claims

*1. Applicable Law*

Plaintiff does not have direct evidence that either race- or age-based discrimination led to termination of his employment. Therefore the court applies the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973), to both his Title VII race discrimination and ADEA claims. Under this framework, the plaintiff bears the burden of production to establish a prima facie case of discrimination. *Id.* at 802. If the plaintiff can do so, then the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* The defendant's articulation of a nondiscriminatory reason causes the presumption of discrimination created by the prima facie case "to simply drop[] out of the picture," *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993), and the plaintiff must prove that the proffered reason is in fact pretext—that is, that the true motivation was improper discrimination.

The plaintiff can show pretext using circumstantial evidence, as by identifying "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's

proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons." *Morgan v. Hilti*, 108 F.3d 1319, 1323 (10th Cir. 1997) (*quoting Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951–52 (3d Cir. 1996)). Because the question arises in context of Defendant's motion for summary judgment, "all doubts concerning pretext must be resolved in plaintiff's favor," but the plaintiff must produce more than bare allegations to defeat the motion. *Id.* at 1324.


*2. Prima Facie Case and Defendant's Proffered Nondiscriminatory Reasons*

        Plaintiff's prima facie case under both Title VII and ADEA requires establishing four elements. As a terminated employee, Plaintiff must show that (1) he belongs to a protected group, (2) that he was qualified for his position, (3) that he was terminated, and (4) someone else was hired to fill his position. *See Brown v. Parker-Hannifin Corp.*, 746 F.2d 1407, 1409–10 (10th Cir. 1984) (*citing Crawford v. Ne. Okla. State Univ.*, 713 F.2d 586, 588 (10th Cir. 1983)).

        The parties provide little discussion of whether Plaintiff makes out the prima facie case under either Title VII or ADEA, but Defendant concedes the issue.[1] Plaintiff is African-American and was 51 years old at the time Defendant terminated his employment. (Compl. ¶¶ 4, 22.) Plaintiff's complaint states that Defendant employed a younger, white manager to fill his store manager position. (*Id.* ¶ 14.)

        Defendant does provide a legitimate, nondiscriminatory reason for its termination of Plaintiff's employment—that Defendant's investigation substantiated numerous instances of

---

        [1]Defense counsel conceded this issue at the pretrial conference. (*See also* MSJ at 15.)

gross misconduct by Plaintiff. This misconduct fall into three categories.

First, Defendant found that Plaintiff had engaged in harassing and inappropriate conduct. For example, he made sexually suggestive comments during store meetings. (MSJ ¶ 11.) Plaintiff also took a group of female hourly associates on overnight trip to visit the company's distribution center in Buckeye, Arizona. (*Id.*) Plaintiff offered to remove a disciplinary action from the record of an associate who agreed not to report Plaintiff's fraternization with a female associate. (*Id.*) Defendant also found that Plaintiff had verbally threatened and intimidated employees who filed reports regarding his misconduct. (*Id.* ¶¶ 22–26.) Defendant substantiated reports that Plaintiff had ordered the demotion of an associate, Daren Finch, without following Wal-Mart procedures. (*Id.* ¶¶ 13–15.)

Defendant's investigation also uncovered a number of instances in which Plaintiff misappropriated company funds. In particular, Plaintiff used funds from the cash office for improper expenses on the Buckeye trip. These included hotel, meal, and t-shirt expenses incurred during an unauthorized detour to Tucson the day after the visit to the Buckeye distribution center. (Webster Decl. ¶ 17.) Defendant found that Plaintiff allowed employees to indicate eight hours of work on their time sheets during the day they spent in Tucson. (*Id.*) Defendant also found that Plaintiff had direct billed Wal-Mart for a hotel room for his wife (*id.*), and there were several substantiated reports of Plaintiff using company funds to purchase Wal-Mart gift cards that Plaintiff then gave out in return for personal favors by female associates. (MSJ ¶¶ 16–18.)

Finally, Defendant substantiated reports that Plaintiff maintained an inappropriate relationship with and directed favoritism towards a female department manager, Laura Quintana. (MSJ ¶¶ 19–20.) Specifically, Defendant corroborated reports that Plaintiff had visited Ms.

Quintana at her home, given her a $250 gift card, ordered lay-away items for her in his name, and increased her pay substantially more than that of other department managers. (Moore Decl. ¶ 19–20.)

Defendant concluded that Plaintiff's misconduct amounted to gross misconduct, for which Wal-Mart policy requires immediate termination. (*Id.* ¶ 29.)

*3. Plaintiff's Showing of Pretext*

Plaintiff asserts that Defendant's proffered nondiscriminatory reasons for termination of his employment are pretextual. Plaintiff seeks to show pretext in three ways: (1) Defendant was mistaken about the extent and nature of his alleged misconduct and could not have relied on its investigation in good faith; (2) there were procedural irregularities in the investigation and termination; and (3) other management personnel were not terminated for similar conduct.

i. Disputes About Plaintiff's Alleged Misconduct

A significant portion of Plaintiff's Response addresses the alleged misconduct underlying termination of his employment. Defendant argues that the accuracy of its investigatory findings are not pertinent to the question of pretext, only whether it acted on those findings in good faith. However, there is a substantial line of cases in which courts recognize that a plaintiff may challenge a defendant's assertion of good faith by showing that the defendant was substantially mistaken about the facts cited as justification for the adverse employment action. In *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993), the Supreme Court held that "[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by

7

a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to

show intentional discrimination." Similarly, the Supreme Court held in *Reeves v. Sanderson*

*Plumbing Products, Inc.*, 530 U.S. 133 (2000), that where "petitioner made a substantial

showing that respondent's explanation [for the termination] was false," it would be reasonable

for the trier of fact to infer that the "employer is dissembling to cover up a discriminatory

purpose." *Id.* at 147. The Supreme Court observed that such an inference might not be

reasonable where the "plaintiff create[s] only a weak issue of fact as to whether the employer's

reason was untrue and there was abundant and uncontroverted independent evidence that no

discrimination had occurred. *Id.* at 148.

      To show that the defendant's case is unworthy of belief, a plaintiff employee must "cast[]

substantial doubt on *many* of the employer's multiple reasons . . . ." *Tyler v. RE/MAX Mt. States,*

*Inc.*, 232 F.3d 808, 814 (10th Cir. 2000) (emphasis added); *see also Bryant v. Farmers Ins.*

*Exchange*, 432 F.3d 1114, 1126–27 (10th Cir. 2005) (holding that even where plaintiff

successfully disputed only one of the employer's proffered reasons, this was sufficient to defeat

summary judgment because that was the employer's principal reason). In *Jaramillo v. Colorado*

*Judicial Department*, 427 F.3d 1303 (10th Cir. 2005), the Tenth Circuit recognized other

circumstances in which "[s]omething less than total failure of the employer's defense is

sufficient to create a genuine issue of fact." *Id.* at 1310. Two of these circumstances are

potentially applicable to Plaintiff's claim. First, a genuine issue of fact may exist where "the

[employer's] reasons are so intertwined that a showing of pretext as to one raises a genuine

question whether the remaining reason is valid." *Id.* The second circumstance is where one

explanation is "so fishy and suspicious" that a jury could disbelieve the employer's entire set of

justifications. *Id.* (*quoting Russell v. Acme-Evans Co.*, 51 F.3d 64, 69 (7th Cir. 1995)).

This section discusses Plaintiff's rebuttal of Defendant's factual basis for termination of his employment. Keeping in mind that is not the role of this Court to act as a "super personnel department," *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1233 (10th Cir. 2000), I conduct this analysis for the limited purpose of assessing whether Defendant erred, and whether these factual errors are substantial enough to allow a factfinder to conclude that the Defendant did not act in good faith. Based on the facts in the record, I conclude that Plaintiff has failed to "cast[] substantial doubt on *many* of the employer's multiple reasons," *see Tyler*, 232 F.3d at 814, or to show that doubt as to a handful of Defendant's reasons render the remainder of its reasons unworthy of belief.[2]

### 1. Allegations of Harassment and Inappropriate and Threatening Conduct

Plaintiff argues that the "inappropriate, sexually suggestive remarks" Defendant found he made in staff meetings (MSJ ¶ 11) were taken out of context and were not considered offensive

---

[2]Plaintiff argues that the Court should not consider any of the findings of Defendant's investigation as evidence in support of its motion, because these findings are hearsay. (Response at 10–11.) That is, because neither Michael Moore nor Jennifer Boyd (Webster) have personal knowledge of the incidents reported by Wal-Mart associates, their affidavits relating the findings of the investigation are not admissible. Defendant argues that the statements by Wal-Mart associates are not hearsay because they are introduced to show the effect on the listeners (Moore and Boyd), not for the truth of the matter asserted. *See* Fed. R. Evid. 801(c) (defining hearsay as out-of-court statement introduced to prove the truth of the matter asserted); 803(3) (state of mind exception). Defendant offers this evidence only to show Moore's state of mind in deciding to terminate Plaintiff's employment—specifically that he had an adequate basis to make that decision in good faith. (Reply at 5–7.)

Defendant clearly is seeking to admit the investigatory findings merely to show Moore's motivation for terminating Plaintiff's employment, not to prove the truth of the information the witnesses provided and on which Moore acted. Therefore, the affidavits of Moore and Webster contain information admissible as nonhearsay.

by any of the employees present. (Response, Pl.'s Statement of Undisputed Material Facts ("PUMF") ¶ 4 (citing to Estrada Dep. at 19:13–19; Chavez Dep. at 67:14–16.)) Plaintiff's evidence shows only that two other managers, Mr. Estrada and Mr. Chavez, did not find the comments offensive, but the fact that some Wal-Mart employee *did* report the statements indicates that they were perceived as offensive or an ethical violation by at least one person. Plaintiff's argument misses the mark on another important ground as well. Defendant concluded that the very fact that Plaintiff made these statements violated company policy and the Defendant's Statement of Ethics. (MSJ ¶¶ 11–12.) Defendant's policies apparently condemn such remarks regardless of how they are subjectively interpreted by listeners.

Another basis for termination of Plaintiff's employment was Defendant's finding that he was the "only member of management accompanying an all-female group of hourly associates on the trip to Buckeye . . . ." (Webster Decl. at 3, ¶ 11.) Plaintiff does not dispute that this trip occurred as Defendant describes, but contends that the department managers themselves decided that the trip would include only females. (Cooper Dep., Reply Ex. D, at 151–54.) Plaintiff does not discuss the appearance of impropriety and conflict of interest arising from the circumstances of the trip. As Defendant argues in connection with a different allegation, Wal-Mart's Conflict of Interest Policy imposes on managers "a responsibility to avoid situations . . . that involve an actual or possible conflict of interest and that the appearance of a conflict may be just as damaging as an actual conflict." (MSJ ¶ 21.) Therefore, regardless of whether Plaintiff has a legitimate explanation for why only female department managers accompanied him on the trip, Defendant's decision that this trip created an apparent conflict of interest is a valid basis for termination of Plaintiff's employment.

10

Defendant asserts that Plaintiff improperly offered to remove a disciplinary action from the record of an associate if she did not report that she saw him leaving the neighborhood of another female associate. (MSJ ¶ 11.) Plaintiff denies that he made such an offer (Response, PUMF ¶ 5) and also argues that store managers have the option to rescind a disciplinary action in the nature of a coaching without approval from the district manager. (*Id.* ¶ 8; Andrade Decl., Response Ex. A, at 76–77.) For the purposes of this motion, the Court accepts as true Plaintiff's statement that did not make such an offer. However, the Court notes that Defendant believed the report of the offer to be credible and there is no evidence that the Defendant relied on the report in bad faith (e.g., knowing or suspecting that it was false).

Defendant's investigation revealed that Plaintiff had maintained an inappropriate relationship with and demonstrated favoritism towards Laura Quintana, a department manager in his store. Plaintiff argues that District Manager Pedro Andrade investigated accusations of fraternization with Ms. Quintana in 2004 and cleared Plaintiff of wrongdoing. (Response, PUMF ¶ 10.) Accepting this as true, I note that Plaintiff does not rebut improper instances that may have occurred since the 2004 investigation. Also, the fact that Plaintiff was cleared in 2004 of fraternization charges does not negate Defendant's argument that Plaintiff had a responsibility under the Conflict of Interest Policy to avoid situations creating an appearance of a conflict. (MSJ ¶ 21.) Regarding Defendant's other findings of favoritism towards Ms. Quintana, Plaintiff admits to visiting Ms. Quintana in her home, putting items on lay-away for her, and awarding her a $250 gift card, which he says was approved by Pedro Andrade. (Response, PUMF ¶¶ 11–12.) Plaintiff does not dispute Defendant's finding that he raised Ms. Quintana's salary substantially more than that of other department managers. (MSJ ¶ 20.) Defendant concluded that these

actions created the appearance of a conflict of interest and therefore justified termination. Even if the actions were not improper or were approved by the district manager, Defendant's judgment that the number of instances of favorable treatment of Ms. Quintana created the appearance of favoritism does not reveal bad faith.

Defendant also found repeated instances in which Plaintiff intimidated staff. For example, Plaintiff had verbally threatened associates who "call[ed] the Home Office on [him]" (Webster Decl. ¶ 23) and told assistant managers that "who he was seeing away from work is none of their business or the business of Wal-Mart." (MSJ ¶ 20.) In addition, Eric Chavez, Plaintiff's co-manager, alleges that Plaintiff dictated a letter to Daren Finch, an associate in the cash office, to be distributed among the other associates working in that office. (Chavez Dep., MSJ Ex. 4 at 61:2–62:10; Ex. 2 thereto.) This letter threatened to retaliate against employees who reported to Plaintiff's superiors on his actions. (Webster Decl. ¶¶ 24–25.) Plaintiff initially stated that he did not remember anything about the letter, but after reviewing it took the position that he could not have dictated the letter, because it is not in his "terminology." (Cooper Dep., Response Ex. D, at 198–99.) Plaintiff has shown that there is a genuine factual dispute about whether he dictated this threatening letter, but he does not rebut the reports of verbal intimidation, which Defendant determined violated Wal-Mart's policies on inappropriate conduct. (Webster Decl. ¶ 25.)

The parties also disagree about whether the temporary demotion of Daren Finch on September 26, 2005 was appropriate. Defendant found that Plaintiff had ordered the demotion of

Ms. Finch without following the company's progressive disciplinary procedures.[3] (MSJ ¶¶ 13–15.) Plaintiff argues that Defendant misunderstood the circumstances of the demotion—specifically, that Ms. Finch's salary was never reduced and that she was reinstated within hours. (Response at 2, ¶ 7; Andrade Decl., Response Ex. A, at 65.) In contrast, Plaintiff's co-manager Eric Chavez confirmed that this was a demotion. (Chavez Dep., Response Ex. C, at 32:6–7.) Plaintiff also notes that he was not present in the store at the time of the disputed events, and that his co-manager, Eric Chavez, actually took the disciplinary action. (Response at 2; PUMF ¶ 6.) Simultaneously, Plaintiff accepts responsibility for the decision to remove Ms. Finch by defending the basis for that decision. (*Id.*) Plaintiff never disputes Defendant's finding that he ordered her demotion, and that he did so without following proper disciplinary procedures, such as first providing Ms. Finch with warnings and coachings.

In conclusion, Defendant received a significant number of reports of harassment of subordinates and other inappropriate conduct by Plaintiff, most of which Plaintiff does not contest. Defendant concluded that this conduct violated company ethics policies, and amounted to gross misconduct justifying immediate termination. Plaintiff's attempt to rebut specific factual findings is inadequate to raise a question in the mind of a reasonable trier of fact as to whether Defendant's findings, and actions in response, were pretextual.

---

[3]The timing of Ms. Finch's demotion also suggests retaliation. When Ms. Finch was interviewed as part of Defendant's investigation of Plaintiff on September 24th and 25th, she told Mr. Gullion that she was uncomfortable talking to him and was afraid that she might be fired for doing so. The next day Eric Chavez demoted her. Ms. Finch had received an "Exceeds Expectations" assessment in July 2005. (*See* Investigative Fact Summary, Ex. A to Webster Decl.)

*2. Allegations of Misappropriation of Company Funds*

Defendant's investigation found that Plaintiff had misappropriated company funds in three circumstances: (1) incurring unauthorized expenses on the trip to Buckeye, Arizona; (2) billing Wal-Mart directly for a hotel room for his wife at the EconoLodge; and (3) using cash office funds to purchase gift cards that he then used for personal purposes. Defendant states that the payments for the Buckeye trip and the EconoLodge, along with the personal use of gift cards violated the company's policy against "Misapplication of Company Funds." (MSJ ¶ 18.)

Plaintiff denies that he misappropriated any funds from the company or his store's cash office. He argues that store managers were authorized to give store employees recognition awards such as gift cards (Response, PUMF ¶ 2), and asserts that the gifts cards he awarded at the store's holiday party were handed out to associates who participated in a group line dance. (Response, PUMF ¶ 4; Estrada Decl., Response Ex. B, at 31–32.) In contrast, Defendant's investigation concluded that the cards were distributed to female associates who danced *with* Plaintiff at the party. (MSJ ¶ 17.) Plaintiff does show that there are disputed issues of fact, but it is questionable whether this dispute is material. Even if Defendant was mistaken about why Plaintiff awarded the gift cards to the female employees, Defendant nonetheless could have legitimate concerns about Plaintiff awarding gift cards for any kind of social activity at the holiday party.

Plaintiff denies that he direct billed Wal-Mart for his wife's stay at the local EconoLodge. Plaintiff insists that Mr. Estrada paid for the room using cash Plaintiff had given him. (Response, PUMF ¶ 7.) Plaintiff cites to the Estrada deposition as support, but Mr. Estrada's statements do not absolve Plaintiff of misappropriation. In his deposition, Mr. Estrada

was asked about whether Plaintiff obtained the cash for the hotel room from the cash office, and Mr. Estrada stated that he had no knowledge on this issue. (Estrada Dep., Response Ex. B, at 70.) The facts regarding payment for the hotel room are in dispute: Defendant alleges that Plaintiff direct billed the company, whereas Plaintiff contends that Mr. Estrada paid for the room in cash, but Plaintiff fails to dispute suggestions raised in the Estrada deposition about the source of this cash.

Plaintiff does not squarely dispute Defendant's finding that the trip to Buckeye involved misappropriation of funds. (MSJ ¶ 11; Response, PUMF ¶ 9.) Plaintiff explains that the trip was approved in advance by the district manager, which Mr. Andrade's deposition transcript confirms. (Response, PUMF ¶ 1; Andrade Dep., Response Ex. B, at 69–70 (stating that he thought the trip was "a good idea")). However, Defendant did not object to the distribution center tour itself, but rather to the fact that Plaintiff was the only male on the trip with subordinate female employees, and that Plaintiff later took some these female employees on a day-long detour to Tucson with no business purpose. Plaintiff never addresses Defendant's finding about the detour to Tucson the day after the visit to the Buckeye distribution center, and that he used funds from the cash office for five hotel rooms and a group meal in Tucson. (*See* Investigative Fact Summary, Ex. A to Webster Decl.) The parties also dispute whether it was proper for Plaintiff to allow the employees to fill out time sheets for portions of this trip. Defendant states that the associates were not working during the eight hours they billed for the day after the visit to the distribution center (Webster Decl. ¶ 17), while Plaintiff explains that he allowed the associates to bill a flat eight hours for travel time, whether they returned to Silver City immediately after the distribution center tour, or after the subsequent day in Tucson.

(Response, PUMF ¶ 9.) Plaintiff creates a genuine factual dispute regarding whether it was appropriate for each associate to log eight hours on her time sheet.

Plaintiff has raised genuine issues of fact regarding his distribution of gift cards, the expenditure of company funds for the EconoLodge room for his wife, and the propriety of his allowing associates to bill certain time on the Buckeye trip. However, Plaintiff does not dispute what is arguably the most significant of Defendant's findings involving misappropriation of funds—the payment of hotel and meal expenses incurred during the unauthorized trip to Tucson.

Although Plaintiff raises genuine questions as to some of the facts supporting Defendant's allegations of misconduct, under *Tyler* and *Jaramillo*, *supra*, Plaintiff must cast substantial doubt on **many** of the employer's explanations of the grounds for its decision. Plaintiff does not effectively rebut more than a few, and arguably not the most critical, of Defendant's justifications for terminating Plaintiff's employment. Nor does Plaintiff demonstrate pretext with respect to any one explanation that is "so fishy or suspicious" that it casts doubt on the remainder of Defendant's explanations. Tenth Circuit law is clear that "[t]he relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs." *Rivera v. City & County of Denver*, 365 F.3d 912, 924–25 (10th Cir. 2004). For Plaintiff to raise a genuine question as to whether Defendant acted in good faith on the proffered factual basis of its decision, Plaintiff must create more than a "weak issue of fact as to whether the employer's reason was untrue." *See Reeves*, 530 U.S. at 148.

In *Reeves*, the Supreme Court affirmed the district court's denial of the defendant's motion for judgment as a matter of law because the plaintiff had fully rebutted each of

16

defendant's justifications for termination of his employment.[4] *Id.* at 144–47. A recent Tenth Circuit decision also illustrates the plaintiff's burden in seeking to show pretext via rebuttal of the defendant's factual basis. In *Miller v. Eby Realty Group LLC*, 396 F.3d 1105 (10th Cir. 2005), the plaintiff was ostensibly terminated as part of a reduction-in-force, but showed that the next day a younger man was hired to fill his exact position. *Id.* at 1113. The employer had also responded to the plaintiff's EEOC complaint with a false explanation for the termination. *Id.* at 1112. The court concluded that plaintiff had created more than a "weak issue of fact" because he had shown that all of the employer's proffered reasons for terminating him were false. The court added: "[i]f the factfinder concludes that one of the employer's reasons is disingenuous, it is reasonable for it to consider this in assessing the credibility of the employer's other proffered reasons." *Id.*; *see also Reeves*, 530 U.S. at 147 (stating that the inference of discrimination from the falsity of the employer's explanation is "consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt.").

Even viewing each disputed fact in Plaintiff's favor, I conclude that Plaintiff has not demonstrated that Defendant's explanations for his firing are unworthy of belief. Plaintiff weakly rebuts only a handful of Defendant's factual findings, sometimes only by citing to conclusory statements in his deposition. Put another way, Plaintiff has not pointed out a "critical mass" of

---

[4]*Reeves* addressed this question about sufficiency of evidence in the context of judgment as a matter of law under FED. R. CIV. P. 50. However, the Supreme Court stated that granting summary judgment and judgment as a matter of law involves the same inquiry. *Id.* at 150 (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986)). The Supreme Court unanimously reversed the court of appeals, which had reversed the district court's denial of the defendant's motion for judgment as a matter of law.

error such that a factfinder could reasonably discredit the remainder of Defendant's proffered justifications. Because "[t]he test is good faith belief," *McKnight v. Kimberly Clark Co.*, 149 F.3d 1125, 1129 (10th Cir. 1998), Plaintiff must show sufficient errors in Defendant's investigation to establish that Defendant was *dishonest* or *disingenuous* in relying on its erroneous conclusions. Here, Plaintiff does not make a "substantial showing that [Wal-Mart's] explanation was false," *Reeves*, 530 U.S. at 144, or show that the limited number of Defendant's explanations that are presumably false are "so intertwined" with the remainder of Defendant's reasons that they too could be disbelieved by the trier of fact.

ii. Procedural Irregularities

Plaintiff argues that procedural irregularities in termination of his employment reveal that Defendant did not terminate him in good faith. Specifically, he argues that Defendant: (1) did not apply its progressive disciplinary policy to him, (2) conducted the investigation in a biased manner, and (3) did not give him an opportunity to explain his side of the story. A plaintiff may demonstrate pretext by showing "disturbing procedural irregularities," such as "deviations from normal company procedure," leading up to the employer's adverse employment action. *See Jaramillo*, 427 F.3d at 1308 (*quoting Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217, 1220 (10th Cir. 2002)).

Plaintiff argues that he was denied the benefit of Defendant's progressive disciplinary policy. However, Defendant's decision to immediately terminate Plaintiff's employment on the basis of gross misconduct rather than proceeding through the progressive disciplinary procedure was not a deviation from company policy. Under Defendant's policy, immediate termination is

18

*required* for instances of gross misconduct, and the company reserves the right to discipline employees outside of the progressive procedure. (Wal-Mart's Coaching for Improvement Policy, Ex. A to Andrade Decl., Reply Ex. 1.) Plaintiff does not acknowledge that Defendant can forego applying the progressive disciplinary policy if Defendant finds substantiated complaints of gross misconduct. In *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1120 (10th Cir. 2007), the Tenth Circuit held that an employer's failure to implement a progressive disciplinary policy that was entirely discretionary was not evidence of pretext. *See also Merritt v. Tellabs Operations, Inc.*, 222 F. App'x 679, 684, 2007 U.S. App. LEXIS 3609, *14 (10th Cir. Feb. 15, 2007) (finding that the employer's failure to follow a progressive disciplinary procedure was not a sufficient irregularity to serve as evidence of pretext because the policy was not mandatory).

Second, Plaintiff states that among 400 employees at his store, Defendant interviewed only twenty-one, and that nearly all of the interviewees were adverse to him. Plaintiff's argument that the investigation was biased is unconvincing. Jennifer Boyd, who led the investigation, was seeking to determine whether the complaints against Plaintiff could be substantiated, and to collect details about the nature of the alleged misconduct. Therefore it was appropriate for Ms. Boyd to have interviewed those who reported and witnessed the alleged misconduct. Ms. Boyd stated that she "conducted the investigation properly and consistent with Wal-Mart policies," (Webster Decl. ¶ 27) and Plaintiff cites no evidence contradicting this assertion.

Plaintiff's strongest argument is that he was not given a chance to respond to the charges against him, which he says the "Respect for the Individual" section of the company's Code of

Ethics requires. (*See* Response, PUMF ¶ 14; Cooper Dep., Response Ex. D, at 83.)[5] Defendant

does not dispute Plaintiff's argument about the Code of Ethics and neither party indicates how

closely the Code of Ethics is typically followed in disciplinary and termination procedures.

Defendant's Coaching for Improvement Policy (the progressive disciplinary policy) also

supports Plaintiff's procedural irregularity claim, though neither party discusses it. The Coaching

for Improvement guidelines instruct the investigator to "discuss the situation with the Associate

to get their side and any additional facts." (Ex. A to Andrade Decl., Reply Ex. 1, at 2.) Following

this step, the investigator is to determine whether the alleged misconduct qualifies as gross

misconduct and whether steps in the progressive procedure may be skipped. (*Id.*) While the

policy states that "Coaching for Improvement will not be used to address gross misconduct," (*id.*

at 4) the requirement to seek out the associate's side of the story seems to apply to investigations

of all misconduct, as the determination of whether the misconduct is "gross" does not occur until

after the step allowing the employee to provide input.

 Defendant's failure to allow Plaintiff a chance to respond to the substantiated allegations

of misconduct casts some doubt about whether he was terminated in good faith. If it is standard

for investigators to seek additional facts and explanation from the employee under scrutiny, then

Defendant's failure to do so in Plaintiff's case undermines Defendant's assertion that it acted in

good faith. At the pretrial conference, defense counsel suggested that lead investigator Jennifer

Boyd had not afforded Plaintiff a chance to rebut these findings because she determined that they

were so numerous that he could not possibly rebut each of them adequately. Defense counsel

---

  [5]Plaintiff did not submit a copy of this policy, but the Court assumes that he correctly
characterizes this section of the Code of Ethics.

also explained that Plaintiff actually used Wal-Mart's Open Door policy after Wal-Mart

terminated his employment to protest this action, and that Wal-Mart considered the evidence and

explanations Plaintiff submitted at that time.

The cases in which procedural deviation has served as evidence of pretext involved more

serious procedural irregularities, usually bolstered by other clear evidence of discriminatory

motive. In *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210 (10th Cir. 2002) the plaintiff

presented evidence that his supervisors did not follow company procedures for notifying him of

his deficient performance, allowed him to languish in the lowest performance group for longer

than permitted by company policy, and failed to provide him with training or guidance to

improve his rank. *Id.* at 1214–15, 1220. Examining Mr. Garrett's constructive discharge claim,

the Tenth Circuit determined that the company's failure to follow policies affording employees

the opportunity to correct deficient performance was a basis for inferring pretext, in light of

significant other evidence of discrimination against Mr. Garrett. *Id.* at 1220. Specifically, Mr.

Garrett's performance evaluations declined at the same time he assumed a "pioneering role" in

the company's program to promote diversity. *Id.* at 1214.

In *Plotke v. White*, 405 F.3d 1092, 1105 (10th Cir. 2005), the Tenth Circuit found that the

absence of any documentation supporting the termination of the plaintiff's employment by the

U.S. Army raised a genuine doubt about the supervisor's motivations, because such

documentation is standard in U.S. Army termination decisions. As in *Garrett*, the court viewed

this irregularity as significant "in aggregate with other evidence proffered by [plaintiff]," *id.*,

including comments by the plaintiff's supervisor that she was hired for the position because he

was "under pressure from the Civilian Personnel Office to hire a female . . . ," and a pattern of

assigning plaintiff to administrative and clerical tasks outside her position description as an army historian. *Id.* at 1094–95; *see also Doebele v. Sprint/United Management Co.*, 342 F.3d 1117, 1139 & n.11 (10th Cir. 2003) (finding disturbing procedural irregularities where an experienced EEO compliance officer employed by defendant testified extensively that she believed a written warning regarding plaintiff was a disturbing deviation from company policy and that she believed it had been fabricated by the plaintiff's supervisors in an attempt to avoid liability).

All of these cases demonstrate that disturbing procedural irregularities contribute to a finding of pretext where there is other strong circumstantial or direct evidence of discriminatory purpose in the record. The procedural irregularities in Defendant's termination of Plaintiff's employment are less significant than those that have previously been found to raise a genuine issue regarding pretext, particularly given that Plaintiff had an opportunity to present a defense and urge reconsideration after termination of his employment. In addition, the record is devoid of other evidence suggesting race or age discrimination against Plaintiff.

iii. Dissimilar Treatment

Plaintiff argues that Defendant treated other managers with similar records of misconduct less harshly.[6] A plaintiff may seek to raise doubts about the credibility of the defendant's asserted nondiscriminatory reason by demonstrating that similarly situated fellow employees were disciplined or treated according to different standards. These fellow employees must be similarly situated, in that they "violated work rules of comparable seriousness." *Kendrick*, 220

---

[6]After termination of his employment, Plaintiff urged Defendant to investigate these other managers, alleging that they engaged in similar misconduct. Defendant investigated the other managers and took action based on Plaintiff's reports of misconduct that were substantiated.

F.3d at 1230. It is also the plaintiff's burden to "rule out nondiscriminatory explanations for the differential treatment." *EEOC v. Flasher Co.*, 986 F.2d 1312, 1320 (10th Cir. 1992); *accord Timmerman*, 483 F.3d at 1121.

Defendant argues that none of the other managers with whom Plaintiff compares himself were similarly situated because none had committed similar violations. The parties' briefs do not make clear what disciplinary infractions these other managers committed, what action Defendant took against them, and critically, whether these managers are outside of Plaintiff's protected race and age categories. It is Plaintiff's burden to place these facts in the record to defeat summary judgment. If Plaintiff endeavors to show dissimilar treatment as evidence that Defendant's proffered explanation is pretextual, then Plaintiff must make a persuasive showing of dissimilar treatment. This includes, as *Flasher* held, ruling out "nondiscriminatory explanations for the differential treatment." 986 F.2d at 1320. Therefore, Plaintiff must provide some evidence to rebut Defendant's nondiscriminatory explanations for why the other managers received less discipline. All reasonable inferences will be made in favor of Plaintiff in deciding Defendant's motion for summary judgment, but the burden remains with Plaintiff to provide sufficient evidence that would enable a reasonable finder of fact to disbelieve Defendant.

The results of Defendant's investigation of the other Wal-Mart management employees are as follows. Two other store managers, Les Williams and Curtis Rosemond, had no substantiated complaints. (Moore Decl. ¶ 38.) Four allegations were substantiated against store manager Miguel Garcia. Two of these involved gifts by Mr. Garcia to other Wal-Mart employees, revealing favoritism. Another substantiated complaint involved Mr. Garcia's friendship with the district manager, Pedro Andrade. Associates reported that this relationship

made them uncomfortable using the company's Open Door policy to file complaints with Mr. Andrade about Mr. Garcia. Another store manager, Dennis Duran, was demoted in response to substantiated reports of misconduct, but the briefs do not indicate the nature of this misconduct. Matt Dominguez's acts of misconduct most nearly approach those of Plaintiff. Defendant's investigation revealed that Mr. Dominguez had engaged in inappropriate conduct and favoritism towards females, had consumed alcohol with hourly associates, and had failed to maintain password and keyword control. (*Id.* ¶ 43.) Mr. Dominguez was demoted two levels (*id.*), though he has since been re-promoted to store manager. Defendant explains that Mr. Dominguez received less discipline than Plaintiff because his conduct was not as recent or severe, and it involved fewer substantiated allegations. (*Id.*) In particular, Mr. Dominguez had not threatened employees with retaliation or otherwise created an intimidating atmosphere at the store, nor had he misappropriated funds. In short, he was not similarly situated to Plaintiff.

Defendant did fire Eric Chavez, Plaintiff's co-manager, for misconduct including his involvement in the improper demotion of Daren Finch. (Reply at 10.) Mr. Chavez is Hispanic and 29 years old and therefore shares neither of Plaintiff's protected classifications. Yet Mr. Chavez received equivalent discipline for similar misconduct. (*Id.*) Plaintiff argues that Mr. Chavez was not similarly situated because he had a lower managerial position than did Plaintiff. Therefore, according to Plaintiff, the termination of Mr. Chavez's employment is not evidence that Defendant disciplines its employees in a nondiscriminatory manner. (Response at 13.) However, it remains Plaintiff's burden to show that Defendant treated other similarly situated employees more favorably, not to simply rebut Defendant's evidence that it treated employees even-handedly.

Plaintiff does not provide the race of each of the other managers whose misconduct he reported. He does state that Garcia, Dominguez, Duran, and Williams are Hispanic, but says nothing about the race of Mr. Andrade, Mr. Rosemond, or Mr. Schield. Plaintiff does not provide age information for any of these managers. Without a clear understanding of whether these comparators are outside of Plaintiff's protected classes, it is impossible to assess whether their treatment, if in fact dissimilar from Plaintiff's, reveals discrimination by Defendant. Moreover, Plaintiff does not rebut Mr. Moore's conclusions that the other managers received lesser discipline because their infractions were not as serious. (Moore Decl. ¶¶ 50–53.) Plaintiff merely points to gaps in Defendant's explanation of the complaints about and discipline for these other managers. However, it is Plaintiff's burden under *McDonnell Douglas* to persuade the factfinder that Defendant's dissimilar treatment reveals pretext.[7]

### 4. Plaintiff Does Not Make a Convincing Showing that Defendant's Proffered Explanation is Pretextual

Plaintiff must show that a reasonable factfinder could determine that Defendant's proffered reasons for terminating him are unworthy of belief. Plaintiff has failed to meet this burden. The record shows that Defendant conducted a careful, thorough investigation of complaints against Plaintiff. The substantiated complaints against him were the kind that justify immediate termination. Plaintiff has not shown that Defendant treated similarly situated managers differently. He has not created a record showing that other managers committed

---

[7]Plaintiff is limited in his attempt to point out gaps in Mr. Moore's explanation because Plaintiff did not depose Mr. Moore or any of Defendant's other investigators. (Reply at 9 n.5.)

equally serious violations of company policy, and has not made clear which of the managers are outside of his protected race and age classifications.

Plaintiff has shown that there were some irregularities in the manner of his job termination, in that he was not allowed to explain his side of the story before Defendant made its decision, although Plaintiff was afforded the opportunity to protest the decision and, in essence, have it reconsidered after being able to present his case. However, in order for procedural irregularities to be evidence that the defendant's explanation is pretextual, they must be "disturbing," which typically requires that the record contain other strong evidence of discrimination. Standing alone, Defendant's termination of Plaintiff's employment without first giving him a chance to defend himself is insufficient evidence to allow a factfinder to disbelieve Defendant's argument that it made its decision because of the gross misconduct allegations, rather than because of Plaintiff's race and/or age. Considering the "totality of [the] circumstantial evidence," *Beaird v. Seagate Tech.*, 145 F.3d 1159, 1174 (10th Cir. 1998), I conclude that Plaintiff fails to raise a genuine issue of fact regarding whether Defendant's proffered nondiscriminatory reasons are pretextual.

**B. ADEA Retaliation Claim**

ADEA prohibits retaliation against employees who engage in protected activity, such as filing complaints of age discrimination. 29 U.S.C. § 623(d) (2006). To establish a prima facie case for retaliation, the employee must show that "(1) []he engaged in protected activity; (2) []he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action." *Timmerman*, 483 F.3d at 1123.

Defendant concedes that Plaintiff engaged in protected activity and suffered an adverse employment action. (MSJ at 14.) In 2003, Plaintiff sent an e-mail to Wal-Mart regional manager Al Serrano complaining of disparate treatment in the hiring decision for district manager. (Cooper Dep., Response Ex. D, at 52–54.) In October 2005, Plaintiff's job was terminated.

However, Defendant argues that Plaintiff cannot establish the third element of the prima facie case: a causal connection between Plaintiff's complaint in 2003 and the termination of his employment in 2005. Defendant makes two arguments for why there is no causal connection. First, Michael Moore, the person who made the 2005 decision to terminate Plaintiff's employment, was unaware that Plaintiff had filed a complaint in 2003. (Moore Decl. ¶ 28.) Second, nearly two years elapsed between the time Plaintiff made the complaint and the date Defendant decided to end Plaintiff's employment. (MSJ at 15.)

The Tenth Circuit has confirmed the common-sense notion that in order for the employee to show retaliation, he must present evidence that the individual decision maker in his case was actually aware of his protected activity. *See Stover v. Martinez*, 382 F.3d 1064, 1073 (10th Cir. 2004); *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993). Plaintiff argues that knowledge of his 2003 complaint should be imputed to Mr. Moore, who is a Senior Vice President in the

company. Plaintiff does not cite to any case law supporting this argument,[8] and other Tenth

Circuit decisions involving organizations have not inferred knowledge on the part of the decision

maker. *See, e.g.*, *Stover*, 382 F.3d at 1072–73 (noting that plaintiff failed to demonstrate that the

agency chairperson who reassigned her knew of plaintiff's EEO complaints); *Williams*, 983 F.3d

at 181 (Air Force supervisor not aware of EEO complaints); *Anderson v. Phillips Petroleum Co.*,

861 F.2d 631, 635 (10th Cir. 1988) (looking to evidence in record that supervisor knew of age

discrimination complaint, rather than imputing knowledge); *Duran v. N.M. Dep't of Labor*, 143

F. Supp. 2d 1278, 1285 (D.N.M. 2001) (noting that plaintiff submitted no evidence contradicting

decision maker's averment that he lacked knowledge of her protected activity), *aff'd*, 26 F.

App'x 880 (10th Cir. 2002).

The twenty-two-month lapse in time between Plaintiff's 2003 complaint and the

termination of his employment in 2005 also undermines Plaintiff's showing of causation. The

Tenth Circuit recently dismissed an Americans with Disabilities Act retaliation claim because a

four-month lapse between the protected activity and the adverse employment action was too

long. *Proctor v. UPS*, No. 06-3115, 2007 U.S. App. LEXIS 22306, at *18–20 (10th Cir. Sept. 18,

---

[8]Plaintiff cites two cases that do not provide support, *McInnis v. Fairfield Communities*, 458 F.3d 1129 (10th Cir. 2006), and *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000). *McInnis* held that if the plaintiff has shown that some management employees had knowledge of discrimination, a jury could find that the employer did not comply with Title VII in good faith, and is therefore not entitled to a directed verdict on the issue of punitive damages. This case does not involve a situation in which an employer denies knowledge of protected activity. *Reeves* held that there was sufficient evidence supporting a jury verdict for plaintiff on a discrimination claim. *Reeves*, 530 U.S. at 152–53. One piece of that evidence was that the decision maker who terminated plaintiff's employment was married to another employee who was openly discriminatory towards plaintiff based on his age. *Id. Reeves* does not address retaliation, nor does it provide any support for the argument that one employee's knowledge of protected activity can be imputed to another simply because they work in the same organization.

2007) (citing Tenth Circuit precedents rejecting claims involving three-month gaps); *see also*

*Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997) ("Unless the termination

is very closely connected in time to the protected conduct, the plaintiff will need to rely on

additional evidence beyond mere temporal proximity to establish causation."). In *Proctor*, the

court held that the four-month lapse itself did not support an inference of causation, and looked

at the plaintiff's other evidence showing causation, including circumstantial evidence that the

employer's decision was pretextual. *Id.* at *20–21; *see also Sauzek v. Exxon Coal USA*, 202 F.3d

913 (7th Cir. 2000) (holding that the *McDonnell Douglas* framework applies where a plaintiff

lacks direct evidence that an adverse employment action was in reaction to protected activity).

Plaintiff asks the Court to draw an inference of causation based on his allegation that

Defendant's method of investigation was skewed to disadvantage him. As discussed in the

preceding section, the only evidence Plaintiff presents in support of this assertion is that

Defendant interviewed only twenty-one of nearly 400 employees at the Silver City store. This

evidence is insufficient to support an inference that the investigation was skewed. Consequently,

Plaintiff fails to put forward adequate circumstantial evidence to demonstrate causation,

particularly in light of the exceptionally long delay between the protected activity and the

adverse employment action.

Plaintiff has failed to establish a prima facie case for retaliation under ADEA and

therefore summary judgment in favor of Defendant is appropriate on that claim.

**C. State Law Claims**

Plaintiff has three state law claims.[9] First, Plaintiff argues that Defendant breached his employment contract by failing to pay him for the work he did on holidays. Second, Plaintiff contends that Defendant failed to pay him for accrued vacation time upon termination of his employment. Third, Plaintiff alleges that Defendant appropriated his name and likeness by continuing to post his picture throughout the store and print his name on receipts after his job was terminated. Defendant moves for summary judgment on all of these claims.

*1. Breach of Contract: Holiday Pay*

Plaintiff maintains that for the seven years he managed the Silver City Wal-Mart, he did not take any of the six Wal-Mart-recognized holidays, and that he was never given "holiday pay" or a day off in exchange. He contends that Defendant therefore must compensate him for forty-two days of accrued holiday pay, or pay for the "compensatory days he was not permitted to take off." (State Compl. ¶¶ 8–13; Response at 13.)

Defendant counters that salaried associates such as Plaintiff are not entitled to holiday pay, but rather receive their "regular amount of pay" for holiday work, and that salaried employees are paid the same amount regardless of whether they work holidays.[10] Plaintiff

---

[9]These claims were originally filed in New Mexico state court. (6th Dist., Grant County, CV-2006-122.) Plaintiff's state court complaint also asserted causes of action for unjust enrichment and prima facie tort. The state court case was removed to federal court based on diversity jurisdiction. It was assigned case number CV 06-468 and was later consolidated with case number CV 06-850, which Plaintiff filed in federal court. (Doc. No. 20.) Plaintiff stipulated during discovery that he is no longer pursuing the unjust enrichment and prima facie tort claims.

[10]In contrast, hourly associates who work on a holiday are paid both "holiday pay" and for the time they actually work that day.

contends that the statement in the holiday pay policy that "[s]alaried associates will receive their regular amount of pay" is ambiguous. (Response at 13.) According to Plaintiff, it could mean that salaried associates will receive their regular amount of pay for a particular pay period, or that they will receive their regular amount of holiday pay. (*Id.*) However, other provisions of the policy eliminate any possible ambiguity. Defendant's holiday policy provides for an alternate day off, in lieu of holiday pay, for salaried associates. (Ex. 25 to Cooper Dep., MSJ Ex. 1.) In addition, holiday pay is calculated based on the average number of hours an associate has worked each day for the past twelve weeks—such a calculation would not make sense for a salaried employee who does not log work hours. Therefore, Plaintiff's claim for accrued holiday pay, as opposed to his claim based on alternate days he was not permitted to take off, is without merit.

In contrast, Plaintiff may have a claim for compensation for the alternate days he did not take off in exchange for his holiday work. Whether Plaintiff is entitled to compensation for these days depends, among other things, on whether these alternate days are provided to employees on a "use it or lose it" basis, and whether the responsibility for invoking the alternate day off benefit falls solely on the employee. Plaintiff testified that no district manager ever approved an additional day off for him, but that he had no written requests for days off to submit into evidence. (Cooper Dep., Response Ex. D, at 287–88.) He also testified that it would have been his responsibility as a store manager to request a day off. (*Id.* at 288.) The holiday policy submitted to the Court does not address these questions, and Defendant does not discuss Plaintiff's entitlement to additional days off as distinct from his claim for holiday pay. In summary, there appears to be a genuine question of fact as to whether Plaintiff requested, but

was denied, days off, and if so, whether he is entitled to compensation.

*2. Breach of Contract: Accrued Vacation Time*

Plaintiff also claims that he had accrued ten weeks of unused vacation time when his employment was terminated in October 2005.[11] (State Compl. ¶¶ 17–19.) Defendant points to its vacation policy (Ex. 24 to Cooper Dep., MSJ Ex. 1.) which states that salaried associates must use accrued vacation time within the following year, "unless postponement is at the Company's request." The critical question that must be answered to determine whether Plaintiff had accrued vacation time for which he was not paid is whether he postponed his vacation at Defendant's request. The current district manager, Pedro Andrade, stated that he never asked Plaintiff to postpone vacation time and that he was not aware that any previous district manager had requested postponement, which would have permitted Plaintiff to carry over his unused vacation time. (Andrade Decl., MSJ Ex. 5.) Plaintiff contends that more than one district manager told him that he could accrue vacation time. (Cooper Dep., Response Ex. D, at 283.) Therefore, there is a genuine issue of material fact as to whether Defendant owes Plaintiff compensation for the vacation time he accrued during his employment. Consequently, Defendant's motion for summary judgment should be denied on this claim.

---

[11] Defendant asserts that Plaintiff conceded during his deposition that he was paid for three weeks of accrued vacation time. (MSJ at 21 (*citing* Cooper Dep., MSJ Ex. 1, at 284.)) However, the deposition transcript does not show that Plaintiff admitted that he had been paid for three weeks of vacation time. Plaintiff agrees that he was paid for some vacation time, but he disputes the amount of the payment and how many weeks of vacation that amount represented.

*3. Invasion of Privacy by Appropriation*

Plaintiff states that for two months after his employment was terminated, Defendant continued to print his name on receipts and to post his picture in the Silver City store. (State Compl. ¶¶ 30, 31, 34.) He contends that he never consented to Defendant's use of his name and likeness, and that Defendant benefitted from this use because of Plaintiff's good reputation in the community. (*Id.*)

New Mexico recognizes the tort of invasion of privacy, but the state case law is scant. *See Benally v. Hundred Arrows Press, Inc.*, 614 F. Supp. 969, 978 (D.N.M. 1985), *rev'd on other grounds*, *Benally v. Amon Carter Museum of W. Art*, 858 F.2d 618 (10th Cir. 1988); *McNutt v. N.M. State Tribune Co.*, 538 P.2d 804, 808 (N.M. Ct. App. 1975); *Bitsie v. Walston*, 515 P.2d 659, 661 (N.M. Ct. App. 1973). However, New Mexico courts have adopted the Prosser framework, which divides the tort of invasion of privacy into four categories. *See Andrews v. Stallings*, 892 P.2d 611, 626 (N.M. Ct. App. 1995); *Moore v. Sun Publishing Corp.*, 881 P.2d 735, 743 (N.M. Ct. App. 1994) (*quoting* Rodney A. Smolla, *Law of Defamation* § 10.01[2], at 10-3 (1994)). The tort of appropriation "consists of the exploitation of the plaintiff's name or likeness, usually for commercial gain." Smolla, *supra*, § 10.01[2], at 10-3 (*as quoted in Moore*, 881 P.2d at 743).

Plaintiff does not dispute Defendant's description of the applicable law. (Response at 14.) The two factual disputes are whether Plaintiff's name and likeness have intrinsic value, and whether Defendant used Plaintiff's name and likeness for commercial purposes.

Defendant asserts that it used Plaintiff's name and likeness for informational purposes—to identify him as the store manager—not for commercial purposes. (MSJ at 23–24.)

The Restatement (Second) of Torts § 652C cmt. c (1977) states that a person's name or likeness is appropriated only where the defendant has "appropriated to his own use or benefit the reputation, prestige, social or commercial standing, public interest or other values of the plaintiff's name or likeness." Plaintiff argues that it is a question of fact whether Defendant used his name and likeness with the intention to benefit from them. However, Plaintiff cannot create a question of fact by merely asserting that Defendant used his name and likeness to take advantage of their economic value—he must put forward evidence in support of those assertions, which he has not done. Plaintiff bears the burden of proof on this element of his claim and must proffer evidence at the summary judgment stage that would be sufficient to permit a reasonable jury to find in his favor at trial. Because Defendant's purpose in using his name and likeness is not a matter of Plaintiff's personal knowledge, his averments contained in his (unverified) pleadings and briefs, are not sufficient to create a genuine question of fact. *See Conaway v. Smith*, 853 F.2d 789, 792 (10th Cir. 1988) ("[A] nonmoving party may not rely merely on the unsupported or conclusory allegations contained in his pleadings . . . .").

Defendant also argues that Plaintiff's claim is without merit because his name and likeness have no intrinsic value. (MSJ at 22.) Defendant presents evidence in support of its argument, including admissions by Plaintiff that he has never been paid to serve as a spokesman, or that he otherwise has been offered compensation for the use of his name or likeness. (Cooper Dep., MSJ Ex. 1, at 293–95.) Plaintiff asserts that the intrinsic value of his name and likeness is a question of fact "not susceptible to determination by summary judgment," and argues that they have intrinsic value because of his popularity in Silver City. (Response at 14–15; PUMF ¶ 19.) Plaintiff states that he was an adjunct professor at Western New Mexico University, and that he

34

believes that people shopped at Wal-Mart because he was the store manager. (Response, PUMF ¶ 19.) However, whether Plaintiff's reputation induced others to shop there is not a matter of Plaintiff's personal knowledge, so he must proffer evidence substantiating this assertion, which he fails to do. *See Conaway*, 853 F.2d at 792.

Plaintiff also asserts that Defendant's continued use of his name and likeness is circumstantial evidence of their intrinsic value. (Response at 15.) However, Defendant points out that it began using Plaintiff's name and likeness immediately upon his arrival in Silver City, long before he could have established any positive reputation there. This bolsters Defendant's claim that it used Plaintiff's name and likeness only for informational purposes, not to take advantage of any intrinsic value they might possess.

A reasonable trier of fact could not conclude that Defendant appropriated Plaintiff's name and likeness for commercial purposes based on the bare and conclusory allegations in Plaintiff's unverified pleadings and briefs. Plaintiff submits no evidence of his reputation or renown in Silver City, nor any evidence that Defendant used Plaintiff's name and likeness to obtain a commercial or other advantage for itself. Therefore, Defendant's motion for summary judgment on Plaintiff's appropriation claim should be granted.

**IT IS THEREFORE ORDERED** that:

I. Defendant's Motion for Summary Judgment as to Plaintiff's claim of race discrimination under Title VII is **GRANTED**.

II. Defendant's Motion for Summary Judgment as to Plaintiff's claim of age discrimination under ADEA is **GRANTED**.

III. Defendant's Motion for Summary Judgment as to Plaintiff's claim of retaliation under ADEA is **GRANTED**.

35

IV. Defendant's Motion for Summary Judgment as to Plaintiff's claim of breach of contract is **GRANTED** as to Plaintiff's claim for "holiday pay" but is **DENIED** as to Plaintiff's claim for compensatory time off and Plaintiff's claim for vacation pay.

V. Defendant's Motion for Summary Judgment as to Plaintiff's claim of invasion of privacy by appropriation of his name and likeness is **GRANTED**.


_____

SENIOR UNITED STATES DISTRICT JUDGE